UNITED STATES of America,
Plaintiff,

v.

Wayne MOUDY, Leo Moudy, John White Moudy and James Moudy, General Partners, d/b/a Moudy Lumber Company, a Partnership,
and
The First National Bank of El Dorado, a National Banking Corporation, domiciled at El Dorado, Arkansas,
and
J. A. Riggs Tractor Company,
Defendants.

Civ. A. No. 742.

United States District Court
W. D. Arkansas,
Hot Springs Division.

Aug. 29, 1958.

Chas. W. Atkinson, U. S. Atty., Henry M. Britt, Asst. U. S. Atty., Ft. Smith, Ark., for plaintiff.

W. S. Atkins, Hope, Ark., for the Moudys.

Mahony & Yocum, El Dorado, Ark., for defendant First Nat. Bank of El Dorado, Ark.

JOHN E. MILLER, District Judge.

On April 17, 1958, pursuant to Findings of Fact and Conclusions of Law upon the issues joined by the pleadings herein, a decree was entered against the defendants Moudy (1) in favor of the plaintiff, United States of America, on behalf of Small Business Administration, an agency and instrumentality of the United States Government, for approximately $46,000 with interest; and (2) in favor of the defendant, The First National Bank of El Dorado, against the defendants Moudy for approximately $26,000 with interest.

A first lien to secure the payment of the judgment in favor of the plaintiff, United States of America, was adjudged on certain property, more specifically described in the decree and hereinafter referred to as Group I, covered by a mortgage executed by the Moudys.

A first lien was likewise adjudged in favor of the defendant, The First National Bank of El Dorado, by virtue of a mortgage that had been executed by the Moudys upon certain property described specifically in the decree, and hereinafter referred to as Group II.

The plaintiff also held a second mortgage on the property referred to as Group II, upon which the defendant, The First National Bank of El Dorado, held the first mortgage.

The decree provided that if the judgments were not paid within a period of time therein fixed, that the property should be sold by a Commissioner appointed by the court. The Commissioner was named in the decree and authorized to sell said property under directions contained in the decree and report his actions to the court.

In accordance with the decree the Commissioner proceeded to advertise the property for sale, and after due and timely notice of the sale, and in accordance with said notice and provisions of the decree, the Commissioner on May 27 proceeded to offer the property for sale to the highest bidder for cash or on credit of three months. Following the sale, the Commissioner reported the same to the court on June 10, 1958, and in said report stated:

"He first offered Group I, the property securing the indebtedness due and owing plaintiff, piecemeal, subject to resale of Group I in bulk and resale of Groups I and II as a whole reserving the right to withdraw such offers for such resales as would bring the highest total bid. With exception of two of the dwellings on the leased land, the caterpillar tractor, an adding machine and typewriter, no bids were received on the property constituting Group I on the Notice and Decree. Withdrawing the offer on piecemeal basis, he offered for sale the leasehold and other property described in Group I in said Decree and received as the highest bid therefor the sum of $27,100.00 from J. M. Hampton and Sons and the same was struck off and declared sold to J. M. Hampton and Sons subject to withdrawal of the offer and resale with all of the property described in Group II of said Decree and Notice.

"He then offered Group II, the property securing the indebtedness due and owing to defendant First National Bank of El Dorado, piecemeal with the right to withdraw such offers and subject to resale of Group II in bulk and the withdrawal of such reoffer in bulk for resale with Group I and Group II as a whole. With the exception of a bid by A. W. Scott in the sum of $1600.00 for the International Truck and its equipment, defendant First National Bank of El Dorado bid,

$15,000.00 for the balance of the property described in Group II of said Notice and Decree. He thereafter offered the property described in Group II of the Notice and Decree and received one bid therefor by defendant First National Bank of El Dorado in the sum of $25,000.00, and, the same being the highest and only bid, he struck off and declared Group II sold to said First National Bank of El Dorado subject to withdrawal of the offer and resale of Group II with Group I as a whole.

"He next offered for sale all the property, described in Groups I and II in the Decree and Notice, as a whole, being all the property ordered sold by the said Decree; whereupon, Mr. Grady S. Grigsby opened the bidding at $52,200.00, the bidding between Mr. Grady S. Grigsby and Mr. J. M. Hampton progressing up to $56,000.00, the highest and best bid for all of said property having been made by J. M. Hampton and Sons of Naples, Texas, and, after withdrawing prior offers and rejecting prior bids, he struck off and declared sold all of the property described in said Decree and Notice to J. M. Hampton and Sons, a partnership composed of J. M. Hampton, M. D. Hampton and J. Morgan Hampton for $56,000.00 on credit for three months subject to the approval and confirmation by the Court."

On June 18, 1958, the court, without objection from anyone, approved the report of sale and directed the Commissioner to execute his bill of sale for said property to the purchasers.

Prior to the confirmation of the sale, the plaintiff filed its petition for distribution, in which plaintiff, inter alia, alleged:

"(3) That pursuant to said Decree, reference being made thereto for the full particulars thereof, all of the collateral securing the judgment in favor of the plaintiff and all of the collateral securing the judgment of the defendant, The First National Bank of El Dorado, Arkansas, was sold at mortgage foreclosure sale by M. M. Beavers, Commissioner appointed by the Court to sell said property, on the 27th day of May, 1958, as more fully appears from Receiver's Report of Sale heretofore filed herein, reference being made thereto for the full particulars thereof.

"(4) That the bid of $25,000.00, made by the defendant, The First National Bank of El Dorado, Arkansas, was a self-serving bid and did not represent the correlative value of the collateral for its judgment.

"(5) That the collateral for the judgments was appraised in the matter of Leo Moudy, John Moudy, Jimmy Moudy and Wayne Moudy, dba Moudy Lumber Company, Bankrupt in Bankruptcy Cause No. 55, in this Court by Nooner Brothers Lumber Company, Hot Springs, Arkansas, and that the total appraised value in the Appraisal Report presented in said bankruptcy cause showed the appraised value of the property securing plaintiff's judgment to be $68,650.00, whereas, the appraised value of the collateral for the judgment of the defendant, The First National Bank of El Dorado, Arkansas, was stated to be $22,000.00. A photostat copy of said appraisal report, made by Nooner Brothers Lumber Company is attached hereto, marked Exhibit 'A', and made a part hereof.

"Wherefore, plaintiff prays the Court to enter an order herein directing the Commissioner, M. M. Beavers, to distribute the proceeds of the sale (after the payment of legitimate expenses of conserving the property involved and after the payment of a reasonable Commissioner's fee) proportionately between the plaintiff and the defendant, The First National Bank of El Dorado, Arkansas, based on the

respective amounts of the judgments held by each as set forth in said decree and, in the alternative, distribution according to the appraised values, whichever is the most equitable."

Subsequent to the filing of the petition for distribution, the court on July 1, 1958, entered an order directing the Commissioner to pay certain expenses amounting to $4,062.22, and on July 30, 1958, entered an order directing him to pay an additional sum of $313.87. However, it appears that of the $313.87, $196.26 was included in the sum of $4,062.22. Thus, the total amount of expenses heretofore directed to be paid is $4,179.83, leaving in the hands of the Commissioner the sum of $51,820.17, out of which the fee of the Receiver and Commissioner should be first paid, and the remainder distributed to the plaintiff, United States of America, and the defendant, The First National Bank of El Dorado, in accordance with the principles of equity.

Prior to the filing of this action for the foreclosure of the mortgages, the defendants, Leo Moudy, John White Moudy, James Moudy, and Wayne Moudy, d/b/a Moudy Lumber Company, were adjudged bankrupt. In the bankruptcy proceedings the property covered by the mortgages was seemingly appraised by someone connected with Nooner Brothers Lumber Company of Hot Springs, Arkansas. According to the petition for distribution, the property included in the mortgage held by plaintiff was appraised at $68,650, and the property covered by the mortgage held by the defendant, The First National Bank of El Dorado, was appraised at $22,000. What purports to be a photostatic copy of the appraisal is attached to the petition for distribution filed by plaintiff, but no testimony has been offered by any party as to the actual market value of the property.

The Moudys were adjudged bankrupt on December 11, 1957, and a Receiver was appointed by the Referee in Bankruptcy, but he was discharged on May 6, 1958, and the petitioners were each discharged on July 31, 1958. The bankruptcy was closed on August 7, 1958. It thus appears that the Trustee in Bankruptcy did not take charge of the mortgaged property, and apparently abandoned any claim as Trustee to any equity in the mortgaged property.

The appraisal hereinbefore referred to is not certified to by anyone, and there is no proof as to who made the appraisal other than it is shown to be upon the stationery of Nooner Brothers Lumber Company of Hot Springs, Arkansas. At the end of each page there appears the following statement:

"The above prices are based on the machinery to be used at its present location. If this machinery is to be sold separately or sold altogether and to be moved to another location there would be a considerable difference in the appraisal price."

The court does not believe that the amounts stated in the alleged appraisal should be accepted as the value of the property covered by the mortgages in view of the manner in which the sale of the property was conducted by the Commissioner. It will be observed that Group I of the property (the property covered by plaintiff's mortgage) was first offered for sale piecemeal, and with the exception of two of the dwellings on the leased land, a caterpillar tractor, an adding machine and typewriter, no bids were made thereon. When Group I was offered for sale as a whole, the highest and best bid received therefor was $27,100 from J. M. Hampton and Sons.

When Group II was offered for sale piecemeal, one bid of $1,600 was received for an International truck and its equipment, and the defendant, The First National Bank of El Dorado, bid $15,000 for the remaining property in Group II. Then all of the property in Group II was offered for sale, and the bank bid $25,000 therefor. Thus, the total of the separate bids for Groups I and II was $52,100. Then the Commissioner proceeded to sell both Groups together, and the highest bid was $56,000 for all

of the property en masse, and the property was sold for that sum.

The question to be determined is what proportion of the net sale price should be distributed to the plaintiff and what proportion should be distributed to the bank.

In paragraph 6 of the decree it is provided:

"If any of the items are sold on credit of three months, the purchaser in each instance shall give security, in addition to retention of title by seller, by posting satisfactory bond in a sufficient amount to insure payment. If the plaintiff, or the defendant, The First National Bank of El Dorado, Arkansas, shall be the highest bidder at said sale, on property upon which it has a first lien, each shall give security only for the amount over and above their respective judgments."

In the prayer of the petition for distribution, the plaintiff asked that the court enter an order distributing the proceeds of the sale, after the payment of expenses of conserving the property and a reasonable fee to the Commissioner, "proportionately between the plaintiff and the defendant, The First National Bank of El Dorado, Arkansas, based on the respective amounts of the judgments held by each as set forth in said decree and, in the alternative, distribution according to the appraised values, whichever is the most equitable."

The defendant Bank contends that, after the payment of the costs and expenses, the proceeds of the sale "should be divided in proportion to the separate bids, that is, $^{250}\!/_{521}$ to The First National Bank of El Dorado and $^{271}\!/_{521}$ to the United States of America for Small Business Administration."

■ Generally speaking, the court having jurisdiction of a foreclosure proceeding may, upon application for such purpose, determine the order of priority of the various liens upon the property and give specific directions as to such distribution and application.

However, there is no question of priority before the court. The plaintiff makes no claim of priority to any of the sale price of Group II, and the defendant Bank makes no claim of priority to any of the sale price of Group I. The plaintiff simply claims that Group I was more valuable than Group II and that its judgment was for a greater amount than that of the defendant Bank. It should be borne in mind that the plaintiff submitted no bid on the property (Group I) upon which it had a first lien. The highest bid submitted on the separate sale of Group I was $27,100. On the other hand, the defendant Bank submitted a bid on Group II of $25,000. The record does not disclose why plaintiff, if it was of the opinion that the property upon which it held a first lien was of the value indicated by the so-called appraisal, did not submit a bid in excess of $27,100, as it had a right to do under the specific terms of the decree. The Bank did submit a bid on the property upon which it held a lien, which, according to the same so-called appraisal, was in excess of the appraised value.

■ Had the separate bids on Group I and Group II been finally accepted, the plaintiff would have received $27,100 to be applied on its judgment, and the defendant Bank would have received $25,000 to be applied on its judgment, less the costs and expenses. However, by selling the property en masse, the Commissioner received $56,000, and in the opinion of the court the said sum of $56,000, after the payment of costs and expenses, should be distributed to the plaintiff and the Bank in proportion to the separate bids on the property.

The parties have not cited any decisions directly in point, and the court is not aware of any decision in a case where the precise question now before the court has been determined. However, the rule of distribution of the proceeds of sales of property en masse in bankruptcy proceedings is well settled.

In the case of In re Wilkes (Leslie v. Knight Soda Fountain Co.), 2 Cir., 55 F.2d 224, the court ordered a sale by

the receiver of the property of the bankrupt Wilkes, to-wit: (1) a soda water fountain and its appliances; (2) a lease of the premises which the bankrupt had occupied; and (3) fixtures and equipment. The sale was to be had in three separate lots, free and clear of all liens, and at the sale the aggregate bids for the three separate lots amounted to approximately $4,000. The bid for the soda water fountain was $1,200. Thus, three-tenths of the aggregate amounts bid was for the soda water fountain. At a meeting of the creditors to consider the bids, an offer of $7,100 was made for the bankrupt's property in bulk, and was accepted by the referee, who thereafter ordered the lienors to prove their lien claims against the estate. The Knight Soda Fountain Company held a chattel mortgage upon the soda water fountain upon which there was a balance due of $2,680.32. No testimony as to the value of the soda water fountain was offered before the referee, except that it had been purchased by the bankrupt for $4,000, approximately two years before the sale. The question before the referee was what portion of the $7,100 paid for all the assets was to be attributed to the fountain upon which the company held its lien. The referee allowed $1,500 to the soda fountain company out of the proceeds of $7,100. Upon a review the court modified the order by allowing the soda fountain company the amount of its claim, $2,680.32. Upon appeal the court at page 225 of 55 F.2d said:

"We cannot regard the allowance of $1,500 to the appellee as based upon any tenable theory. The only basis which we can discover for determining the portion of the $7,100 represented by the soda fountain is the proportion which the bid for the fountain at the first auction sale bore to the bid for all the assets. That was three-tenths which, if applied to $7,100, would result in a share of $2,130. The relation of the bids at a former auction sale was taken by the Circuit Court of Appeals for the Third Circuit as the

basis for determining the amount to be allocated to several pieces of property later sold in bulk. In re Benz [3 Cir.] 218 F. 50."

The rule thus announced was followed by the District Court, W.D.N.Y., in the case of In re Bovenzi, 2 F.Supp. 538.

In the case of In re Mannington Pottery Co., D.C.N.D.W.Va., 104 F.Supp. 506, at page 520, the court said:

"There can be no doubt that in a bankruptcy proceeding that a lien on less than all of several parcels of property sold in one lot may be transferred to the gross proceeds only to the extent as the particular property covered by the lien contributed to the whole fund. In re Wesley Corporation, D.C.E.D.Ky., 18 F.Supp. 347, 350; In re Bowen, D.C. E.D.Pa., 35 F.Supp. 60; In re Hetzel, D.C.M.D.Pa., 23 F.Supp. 530; In re Benz, 3 Cir., 218 F. 50; First Savings & Banking Co. v. Kilmer, 4 Cir., 263 F. 497; Leslie v. Knight Soda Fountain Co., 2 Cir., 55 F.2d 224."

Following this rule the plaintiff should receive $\frac{271}{521}$ of the amount of the accepted bid after the payment of the costs and expenses, and the defendant Bank should receive $\frac{250}{521}$ of said amount.

The record discloses that the Commissioner appointed by the court to make the sale was the Receiver of the property in the bankruptcy proceeding, before the Trustee disclaimed on behalf of the unsecured creditors of the bankrupts. When the foreclosure suit was filed, the court appointed him as Receiver herein. He has devoted considerable time and effort in the preservation of the property, and had charge of the property for several months. No complaint has ever been made of the services rendered by him as Receiver or of his conduct as Commissioner, and the court feels that a reasonable fee for his services as Commissioner and Receiver is $1,800.

Under orders of the court he has paid, or been directed to pay, as expenses a total sum of $4,179.83 and, as above

stated, should be allowed a fee of $1,800, making total expenses of $5,979.83. After deducting the same from the $56,-000, there remains $50,020.17, which the Commissioner should pay to the plaintiff and the defendant Bank as follows:

United States of America—$^{271}\!/_{521}$ of $50,020.17, or $26,018.17.

The First National Bank of El Dorado —$^{250}\!/_{521}$ of $50,020.17, or $24,-002.00.

Under the above formula both plaintiff and defendant actually receive more net money than they would have received had the bid of $27,100 for Group I and $25,000 for Group II been accepted.

After the payment of said amounts, the Commissioner and Receiver shall file a final accounting and report of his action hereunder.

An order in accordance with the above is being entered today.