**In re LTV STEEL COMPANY,
INC., et al., Debtors.**

No. 00–43866.

United States Bankruptcy Court,
N.D. Ohio.

Oct. 24, 2002.

Linda A. Kontos, Hennigan, Bennett & Dorman LLP, Los Angeles, CA, Matthew Fitzsimmons, Richard M. Cieri, Cleveland, OH, for debtor.

Eric A. Schaffer, Pittsburgh, PA, for Creditors' Committee.

## MEMORANDUM OPINION

RUSS KENDIG, Bankruptcy Judge.

This matter is before the Court on the Notice of Allocation and Amended Notice of Allocation of Net Proceeds of the Integrated Steel Sale filed by LTV Steel Com-

pany, Inc., Debtor and Debtor–in–Possession (hereinafter "Debtor") on April 26, 2002 and May 15, 2002 respectively. Various parties (hereinafter "objectors") filed responses and objections to Debtor's amended allocation. Objectors included: Erie Industrial Maintenance, Inc.; Lake Erie Electric, Inc.; Hunter Corp.; Mid-American, Inc.; Cuyahoga County Taxing Authority; Lake County, Indiana; City of East Chicago, Indiana; Viatec, Inc.; Ramirez and Marsch, Inc.; Solid Platforms, Inc.; Field Technologies, Inc.; Meccon Industries; JWP/Hyre Electric Co. of Indiana; Hasse Construction Co., Inc.; Treasurer of Putnam County, Illinois; United Refractories, Inc.; United Steelworkers of America; Precision Environmental Co.; Continental Electric Co.; Graycor Industrial Contractors, Inc.; Graycor Blasting Co., Inc.; Morrison Construction Co., Inc.; Kvaerner Songer, Inc.; Bank One Trust Co., N.A.; City of Buffalo; City of Buffalo Urban Renewal Agency; J.M. Foster, Inc.; Didier—M & P Engineering, Inc.; Colliers International; Viatec, Inc.; Refax, Inc.; Affiliated Steam Equipment Co.; Mellon Bank N.A.; Deichmueller Construction Co., Inc.; and Acme Construction Co. On June 18–19 and July 1–2, 2002, a hearing was held on this matter. This is a core proceeding over which the Court has jurisdiction pursuant to 28 U.S.C. § 157(b)(2)(K) and (O). The following are the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr.P. 7052.

## DISCUSSION

In this proceeding, the Court must determine the allocation of cash proceeds resulting from a sale of several assets sold as one unit. Individual assets are secured by different creditors, each with claims of unique priority. The assets were not valued individually within the purchase agreement. The Court must determine each asset's value and allocate the sale proceeds between the individual assets to permit distribution of proceeds to lienholders.

The assets were sold in bulk pursuant to this Court's order. *See* Order, Feb. 28, 2002 (Doc. # 2604) (hereinafter "Sale Order").[1] In the Sale Order, this Court approved the sale of substantially all of Debtor's integrated steel assets (hereinafter "assets")[2] free and clear of liens to WLR Acquisition Corp. (n/k/a/ International Steel Group, Inc.) (hereinafter "ISG"). *See id.* ISG assumed liabilities and paid cash of Eighty Million Dollars ($80,000,-000). Debtor values the transaction at One Hundred Ninety–Four Million Dollars ($194,000,000). *See* Tr. of Sale Hearing, Feb. 28, 2002, at 8–9. Debtor claims that sale expenses totaled Fifteen Million Dollars ($15,000,000). *See* Amended Notice of Allocation of Net Proceeds of the Integrated Steel Sale, May 15, 2002, Ex. A, at 1 (Doc. 3434) (hereinafter "Amended Allocation").

The Sale Order established an allocation process for assigning the proceeds from

---

**1.** The Court only characterizes the terms of the orders and other matters of record for purposes of simplifying the matter. Otherwise, the Court acts upon the fundamental premise that previous orders and other matters of record are entitled to the effect described by Dr. Seuss: They mean what they say and they say what they mean. *See* DR. SEUSS, HORTON HATCHES THE EGG (1940); *see also Singer v. U.S.,* 323 U.S. 338, 345, 65 S.Ct. 282, 89 L.Ed. 285 (1945).

**2.** The assets include: Cleveland Works; Indiana Harbor Works; Hennepin Works; Lorain Pellet Terminal; Grand River Lime Plant; Short–Line Railroad; LTV Tech Center; Cleveland Natural Gas Reserves; L–SE Equity Interest; L–SE Real Property; Warren Code Facility; and Pre-paid Expenses.

the sale to the individual assets for distribution to lien claimants. *See* Sale Order at 8–9 (describing lien treatment procedures). On April 26, 2002 and May 15, 2002, respectively, Debtor filed a Notice and an Amended Notice of Allocation of Net Proceeds of the Integrated Steel Sale. Debtor's allocation distributes the cash proceeds to the individual assets. Several parties objected to Debtor's valuations of assets and resulting cash sale proceeds allocation.

## I. Preliminary matters

### A. Bifurcation of issues

This Court bifurcated the issues involved in distributing the sale proceeds. During the hearing held June 18–19 and July 1–2, 2002 (hereinafter "allocation hearing"), evidence was presented concerning asset valuations and allocation methodologies. Evidence was not presented on the validity, priority, or amounts of individual liens. Therefore, this memorandum opinion only resolves issues related to the valuation of assets and the allocation of cash proceeds among the assets. The Court retains jurisdiction over issues involving the validity, priority, and amounts of liens associated with the assets, prior to sale.

### B. Misrepresentations during the February 28, 2002 hearing and fundamental fairness

■ During the allocation hearing, objectors claimed that statements made during the February 28, 2002 hearing (hereinafter "sale hearing") contained misrepresentations. Specifically, at least one of the counsel for objectors stated that he left the February sale hearing thinking that sale proceeds would be sufficient to satisfy all liens burdening the assets. *See* Tr. of Allocation Hearing, July 2, 2002, at 82–83. This may explain objectors' state of preparedness and the absence of any allocation or paradigm other than Debtor's.

In the voluminous motions and memoranda filed before the hearing on this matter, objectors failed to raise objections based upon prior alleged misrepresentations. During the four days of evidence presented in this matter, no evidence of misrepresentation was presented. Finally, after the evidence was closed, a serious allegation of misrepresentation was mentioned without supporting references.

Even if objectors had properly raised the misrepresentation claim, the substance of the argument is unpersuasive. The Court reviewed the transcript of the sale hearing. Debtor did not guarantee that all of the liens would be satisfied by the sale proceeds. Debtor's counsel stated that "a fund" would be "available to pay liens." *See* Tr. of Sale Hearing, Feb. 28, 2002, at 52. Moreover, Debtor argued at length that a sale free and clear of liens was legally permitted even if all liens were not satisfied by sale proceeds. At the sale hearing, Debtor's counsel stated:

> [W]e've had some parties complain that their liens should be paid in full regardless of anything else, that their method of adequate protection should be to pay the liens in full and that is not a requirement, Your Honor, of Section 363(f).... Cases have said on multiple occasions ... that a sale free and clear is appropriate even when the proceeds are not sufficient to cover the full amount of the liens. This is consistent with Section 506(a), Your Honor, which describes secured claims.... [W]e've sold the assets for what the market will bear, we've monetized the collateral, put it into ... escrow, the liens attach [to the proceeds in] the same priority. If the proceeds are insufficient, it simply means that the liens were undersecured.

*Id.* at 52–53. Debtor's argument, during the sale hearing, that the proceeds from a sale free and clear of liens need not satisfy all liens, was sufficient to put the lienholders in this matter on notice that Debtor would move forward with the sale even if cash proceeds were insufficient to satisfy all liens.

The following points in the record further support the conclusion that, at the sale hearing, the payment of any particular claim was uncertain:

1. When the CEO of LTV, Glen Moran (hereinafter "Moran"), was asked if the sale proceeds would exceed the total amount of mechanics' and tax liens, he answered that based upon the information currently available to him, he thought that they would be paid, but also stated "that's not a final determination." *See id.* at 41.

2. Moran was specifically asked whether proceeds allocated to Indiana Harbor Works would exceed the amount of mechanics' liens. Moran answered "I don't ... have the ability to say how the proceeds are going to be divided." *See id.* at 45.

3. When lienholders expressed concern about the allocation of net proceeds and whether the allocation would be enough to cover all of the secured claimants, the Court stated that if concerns remained after the proceeds were allocated, there would be an allocation hearing. *See id.* at 70, 73–74 (a party did not want payment of a lien to be limited by a future allocation of insufficient proceeds); *see also id.* at 77 ("If the purchase price is allocated more towards personal property than real estate ... it will reduce the dollars that are available to pay things like real estate property taxes that are outstanding.")

The Court also pointed out that the Sale Order would establish finality for appeal purposes. *See id.* at 73. There was no appeal or motion for relief from the Sale Order.

■ Case law also placed lienholders on notice that all liens on the assets may not be paid. The mere fact that a sale free and clear of liens fails to result in the full payment of lien creditors does not render a sale invalid. *See In re Beardsley,* 38 F.Supp. 799, 803 (D.Md.1941). Therefore, the Court concludes that objectors' claim of misrepresentation or inadequate time to prepare is unsupported and unpersuasive.

The Sale Order set a process in motion that was advantageous to Debtor, but objectors did not timely seek to reconsider those constraints or to prepare for the ultimate hearing. For example, it was only in the eleventh hour that Cuyahoga County retained bankruptcy counsel, who did a remarkable job given the time restraints imposed by his client. The problem arose more from the objectors' lack of awareness or preparation than from any misrepresentation or unfair advantage taken by Debtor. Debtor seized the initiative and drove it to its full advantage in the face of the limited response. This is the way the adversarial system functions.

## C. William West's and Paul Hufford's testimony concerning environmental liability evidence

Objectors contest the admissibility of William West's testimony and two documents prepared by West, Debtor's exhibits B and C. West is the Director of Environmental Control for Debtor. Debtor hired Arthur D. Little, Inc. (hereinafter "Little") and Civil Environmental Consultants (hereinafter "CEC") to prepare reports regarding environmental liabilities associated with the integrated steel assets. West gave Little and CEC information to aid in the formation of reports. West used the Little and CEC reports, along with his

own practical experience, to produce Debtor's exhibits B and C.

■ Objectors argue that West's testimony is inadmissible pursuant to Federal Evidence Rules 602 and 701.[3] West testified as a lay witness about environmental costs associated with the integrated steel assets. Evidence rules 602 and 701 govern lay testimony. Rule 602 states: "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." FED. R. EVID. 602. Rule 701 states:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical or other specialized knowledge within the scope of Rule 702.

FED. R. EVID. 701.[4]

It is undisputed that West's testimony fulfills Rule 702's first two prongs. The third prong, involving "scientific, technical or other specialized knowledge" remains disputed. Specifically, objectors argue that West's testimony about projected environmental costs is inadmissible because the projections involve scientific, technical, or other specialized knowledge.[5] Following objectors' logic, a Court may never permit a lay witness to testify about scientific or technical data. This theory is not supported by common sense or precedent.

Historically, Rule 701 permitted lay witness testimony relating to scientific or technical subjects. It is well settled that a lay witness may offer testimony based upon observation and experience. *See U.S. v. Paiva*, 892 F.2d 148, 157 (1st Cir. 1989); *Soden v. Freightliner Corp.*, 714 F.2d 498, 512 (5th Cir.1983); *U.S. v. Walker*, 495 F.Supp. 230 (W.D.Pa.1980). Prior to the recent amendment to Rule 701, Courts admitted lay witnesses' observations involving scientific or technical information. *See United States v. Westbrook*, 896 F.2d 330 (8th Cir.1990) (permitting heavy amphetamine users to identify a substance as amphetamine); *Farner v. Paccar, Inc.*, 562 F.2d 518 (8th Cir.1977) (permitting a witness who had been in the

**3.** During the allocation hearing, various parties sought exclusion of William West's testimony via an oral motion *in limine*. During the hearing, objectors submitted a written motion *in limine* to the Court without filing it with the Clerk of Courts' office. Several days later, the motion was filed. Subsequent to the hearing, objectors filed their written objections to William West's testimony. Debtor and JPMorgan Chase Bank opposed the motion *in limine* orally and in writing.

**4.** This language reflects an amendment effective December 1, 2000.

**5.** Recently, standards for admitting expert and lay opinion testimony have been elevated to avoid proffers of "quack science." The text of Rule 701 referring to testimony about scientific or technical subjects became effective December 1, 2000 in response to amended Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). "In [*Daubert*] the Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony based in science." Advisory Committee Notes, FED. R. EVID. 702. Rule 701, involving lay opinion testimony, was amended to eliminate the risk that Rule 702 and *Daubert* expert opinion testimony standards would be evaded through proffer under Rule 701. Simply stated, Rule 701 was amended to reduce the "back door" admission of expert opinion testimony. In this case, West does not provide the type of quack science evidence that the recent changes in Rules 701 and 702 sought to eliminate.

trucking industry for thirty years to testify about the use of safety chains).

This is consistent with logic and practice. Most witnesses in complex matters have helpful background and experience, as did most of the witnesses in this case. Most testimony lies somewhere in the vast region between the illiterate eyewitness, who testifies only that "the light was green," and the Nobel laureate, who explains the mapping of the human genome. Commentary, practice, and case law support recognizing this reality.

The Advisory Committee Notes accompanying Rule 701 explain that the rule's amendment was not intended to ban all lay witness scientific or technical testimony. The Advisory Committee Notes specifically address the admissibility of lay witness testimony, in corporate situations similar to this case, involving business projections. The Notes state that "most Courts have permitted the owner or officer of [a business] to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert." Advisory Committee Notes, FED. R. EVID. 701 (citing *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153 (3d Cir.1993)).

> Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business. This Amendment does not purport to change this analysis.

*Id.*

■ Objectors argue that projections created by West are inadmissible because they contain layered hearsay. Objectors' argument is unpersuasive. Lay witnesses may rely on reports prepared by outsiders. *See Lightning Lube, Inc. v. Witco,* 4 F.3d 1153, 1175 (3d Cir.1993). In *Lightning Lube,* an officer of a company was permitted to testify to projected lost profits. In creating his projections, the officer relied upon the reports of an accountant. *See id.* at 1175. The Court concluded that "given [the witness's] knowledge and participation in the day-to-day affairs of [the] business, [the witness's] partial reliance on [a] report, even if prepared by an outsider, does not render [the witness's] testimony beyond the scope of R. 701." *Id.* West's testimony in this case is analogous to *Lightning Lube.* West offered testimony concerning the projected cost of environmental liabilities. Although he relied, in part, on reports furnished by others, West relied upon his own knowledge and daily participation in the Debtor's affairs to prepare his projections. Therefore, the Court concludes that West's reliance on the CEC and Little reports fails to render Debtor's exhibits B and C inadmissible.

■ Objectors further argue that Debtor's exhibits B and C are inadmissible because they are hearsay documents. By definition, hearsay is offered to prove the truth of the matter it asserts. *See* FED. R. EVID. 801(c). Exhibits B and C summarize costs associated with environmental liabilities. Debtor argues that the exhibits were not offered to prove an exact amount of environmental liabilities, and therefore were not offered to prove the truth of the matters they assert. The Court concludes that Debtor's exhibits B and C were not offered for their truth, but instead were offered to show the state of mind with which potential buyers approached the sale of the integrated steel assets. "An out of court statement that is offered to show its effect on the hearer's state of mind is not hearsay." *See U.S. v. Hanson,* 994 F.2d 403, 406 (7th Cir.1993). Testimony from the Buyer's president, Rodney Mott (hereinafter "Mott"), further explained how bidders were affected by the

environmental costs. Prior to ISG buying the assets, Mott concluded that the assets required significant annual costs to remain compliant with environmental regulations. *See* Mott Depo., Allocation Hearing, All Objectors' Ex. 1, at 42–43 (hereinafter "Mott Depo.") (testifying that hundreds of millions of dollars in liabilities could be triggered at any time). Mott and Paul Hufford (hereinafter "Hufford"), Debtor's valuation expert, did not rely on the truth of the environmental condition of Debtor's facilities, as reported in exhibits B and C, but on how what was known and unknown environmentally affected the price of the assets. As such, West's testimony and Debtor's exhibits B and C are admissible nonhearsay.

■ Even if Debtor's exhibits B and C were inadmissible, Hufford would still be permitted to rely upon these exhibits in forming his valuation opinions.[6] As an expert, Hufford may rely upon inadmissible facts or data. *See* Evid. R. 703. The environmental liability reports were among the many sources of information relied upon by Hufford in valuing the assets. *See infra.* Hufford relied on environmental information, available prior to the sale as part of an extensive collection of due diligence documents known as the "Data Room," in concluding how the environmental liabilities would affect the price of the assets.

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 596, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (citation omitted). Objectors had ample opportunity to cross examine West and provide contrary evidence. It is important to note that objectors submitted little argument or evidence that West's testimony or reports are unreliable.

For the foregoing reasons, the Court concludes that West's testimony and Debtor's exhibits B and C are admissible.

## II. Valuation and Allocation

This Court must determine the portion of the cash amount paid for all of the integrated steel assets attributed to each of the individual assets. Debtor provided a paradigm, a theoretical framework for allocating the value, which was presented with a Mona Lisa smile as a form of "standard operating procedure for allocations." In reality, few cases deal with valuation in the allocation context. There is no standard operating procedure. In the more than fifty (50) allocation pleadings, only six (6) cited cases deal directly with allocating sale proceeds. Only a handful of allocation cases exist and those provide little guidance in a case as complex as the case at bar.

The goal is to determine the value of an individual asset as a portion of the whole sale. *See generally Leslie v. Knight Soda Fountain Co. (In re Wilkes),* 55 F.2d 224 (2d Cir.1932); *In re 26 Trumbull Street,* 77 B.R. 374 (Bankr.D.Conn.1987); *First Federal Savings & Loan Assoc. of Pine Bluff v. Dickinson (In re Port City Construction Co., Inc. & Oak Park Heating & Air Conditioning Co., Inc.),* 387 F.Supp. 236 (E.D.Ark.1975) (hereinafter *"First Federal"*); *United States v. Moudy,* 164 F.Supp. 490 (W.D.Ark.1958); *In re Mannington Pottery Co.,* 104 F.Supp. 506 (N.D.W.Va. 1952); *In re Beardsley,* 38 F.Supp. 799 (D.Md.1941); *In re Wesley Corp.,* 18 F.Supp. 347 (E.D.Ky.1937); *In re Bovenzi,*

---

**6.** Hufford prepared Debtor's valuation and allocation of sale proceeds. *See* The LTV Corp. Steel Asset Sale Cash Purchase Price Allocation, Allocation Hearing, Debtor's Ex. A (hereinafter "Hufford's Report").

2 F.Supp. 538 (W.D.N.Y.1932). Courts conclude, in one fashion or another, that valuing assets and allocating sale proceeds is a fact intensive process. Neither the Court nor the parties located authority for use of a particular model or paradigm for allocating in this complex setting.

Debtor proposed a model based upon interpreting 11 U.S.C. § 506(a) (hereinafter "506(a)"). Debtor employed consultants to evaluate the facts relevant to each facility to determine the value for the assets as a going concern.

Objectors did not advocate any theory or paradigm, but three themes recur: (1) objectors generally oppose the going concern value approach; (2) objectors claim that it is unfair, or illogical, to assign a zero value to any of the assets, because the asset's existence or purchase is proof of some worth; and (3) objectors argue for what the Court will denominate as compartmentalizing, which is the perceived ability to carve off the fruit of an asset (*i.e.*, a facility's equipment) and assign that carved off piece's value to the secured claims, while ignoring or leaving behind the poisoned stems and roots, the environmental liabilities associated with the facility from which the asset was removed.

The Court considered the development of different paradigms for valuing parts of an enterprise and the related liabilities. The Court gave considerable thought to potential models and concludes that it would be unfair to apply a model that has not been considered or argued by the parties. We proceed with these caveats and regrets in the rear view mirror, but sadly still in sight.

## A.  Allocation of Sale Proceeds

■ The Court must allocate Eighty Million Dollars ($80,000,000) in cash sale proceeds. When several assets are sold as one unit, Courts determine the value of each asset based upon competent evidence. *See In re Mannington Pottery Co.*, 104 F.Supp. at 520 (citation omitted). Courts have concluded that competent evidence of valuation may be determined through various methods. For example, Courts have relied upon bids as competent evidence of valuation. *See Leslie*, 55 F.2d at 225; *Marine Nat'l Bank v. McCreery & Co. (In re Benz)*, 218 F. 50, 52 (3d Cir.1914); *Moudy*, 164 F.Supp. at 491–92; *In re Wesley*, 18 F.Supp. at 349; *In re Bovenzi*, 2 F.Supp. at 538. Courts also rely on appraisement "and any other competent evidence offered" on the subject of valuation. *In re Wesley*, 18 F.Supp. at 349; *In re Trumbull Street*, 77 B.R. at 374–75 (relying on an appraisal using liquidation valuation principles); *First Federal*, 387 F.Supp. at 237 (relying on a pre-sale valuation conducted during bankruptcy proceedings); *In re Mannington Pottery Co.*, 104 F.Supp. 506; *In re Beardsley*, 38 F.Supp. at 802; *In re Hetzel*, 23 F.Supp. at 530; *see also In re Trumbull Street*, 77 B.R. at 374–75 (relying on comparable rents to value a leasehold interest). Sale proceeds must be attributed to individual assets before the treatment of liens on each asset can be considered. *See In re Wesley Corp.*, 18 F.Supp. at 349. "[A] lien on less than all of the several parcels of property sold in one lot may be transferred to the gross proceeds only to the extent as the particular property covered by the lien contributed to the whole fund." *In re Mannington Pottery Co.*, 104 F.Supp. at 520 (citation omitted); *In re Wesley Corp.*, 18 F.Supp. at 350. Courts allocate sale proceeds between individual assets based upon each asset's portion of the total value of all of the assets. *See generally Leslie*, 55 F.2d 224; *In re 26 Trumbull Street*, 77 B.R. 374; *First Federal*, 387 F.Supp. 236; *Moudy*, 164 F.Supp. 490; *In re Mannington Pottery Co.*, 104 F.Supp. 506; *In re*

*Beardsley,* 38 F.Supp. 799; *In re Wesley Corp.,* 18 F.Supp. 347; *In re Bovenzi,* 2 F.Supp. 538. Before determining each asset's portion of the cash proceeds, each asset must be valued.

### B. Valuing the assets

■ The United States Supreme Court concluded that 506(a) tells Courts how to value property. *See generally Associates Commercial Corp. v. Rash,* 520 U.S. 953, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997). Pursuant to 506(a), the value of an asset shall be determined in light of its "disposition or use." *See id.* Disposition or use of collateral "turns on the alternative the debtor chooses[.]" *Id.* at 961, 117 S.Ct. 1879.

### C. Compartmentalizing, the 506(a) Mandate, and Casting the Die

Debtor argues for valuing the assets on a going concern basis using facility by facility analysis, *e.g.* Indiana Harbor Works, Hennepin, LTV Tech Center, and so on. Objectors argue for compartmentalizing. *See supra* section II (describing objectors' valuing certain parts of assets, while ignoring parts burdened with environmental liabilities). The effect of the difference is obvious. Valuable equipment is far less so if it must be valued as a package with the environmentally damaged site.

Debtor valued each site as a part of the going concern whole, thus offsetting in whole or in part the value of personal property or fixtures attached to environmentally sensitive real estate. If correct, the question is not merely the accuracy of objectors' equipment appraisals, but the materiality of the appraisals if personal property value is inseparable from the premises.

The net effect of Debtor's approach is to place the cost of environmental liabilities on the secured creditors, for the benefit of the public at large.[7] Conversely, objectors' approach would preserve the value of the assets for secured creditors and place the cost of environmental liabilities on the public and, to the extent of any dividend, unsecured creditors.

■ Persuasive policy arguments may be made for either position, but the Court need not decide which is appropriate. The die was previously cast by the terms of 506(a). Section 506(a) requires that "[s]uch value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property[.]" The disposition or use was a sale as a going concern to be operated as a going concern. ISG agreed to indemnify the Debtor for any environmental liability and the net cash price was reduced as a result.

■ This result is counterintuitive to bankruptcy participants, because going concern sales normally result in higher valuations. This expected result does not occur in this case because the going concern value premium, whether denominated as goodwill or otherwise, is more than

---

7. This assumes that there will not be a dividend to unsecured creditors. If there is a dividend at least as large as the environmental liabilities, the net effect would be to impose the cost on secured creditors for the benefit of the unsecured creditors. The benefit would be proportionately shared by the public at large and the unsecured creditors to the extent there is some dividend to unsecureds, but the total dividend is less than the environmental cost. The administrative claims of the estate add an additional layer, but the concept is the same. A more compelling argument could be made for compartmentalizing that portion of the proceeds that would remain for distribution to unsecured creditors. This argument was not made and there is no evidence that there will be any meaningful distribution to unsecured creditors.

offset by the perceived environmental cost assumed. Section 506(a) does not mandate that going concerns are valued higher. That is a common, but sometimes misplaced, assumption. Rather, section 506(a) dictates valuation in light of the proposed disposition or use. In this case, the disposition and use was as a going concern. Personalty and realty were bundled together, their positive and negative values inextricably intertwined.

Much like the pathologist, objectors prove much, but too late. The sale was as a going concern, purposefully cutting off environmental liabilities, and knowingly reducing the cash price. Personal property, fixtures, real estate, and intangibles were sold together to be operated as a going concern.

Section 506(a) cast the die and the Sale Order was forged in it. The result is impelled by 506(a) and any balancing of harm or policy considerations could only be made at the time of the sale. Once approved, the nature and structure of the sale became a fact dictating the valuation analysis through the application of 506(a).

Witnesses testified to several different valuation methodologies. Debtor's expert witness, Hufford, valued all of the assets. Hufford is a Senior Managing Director in the restructuring section of the Blackstone Group, an investment banking firm. *See* Tr. of Allocation Hearing, June 18, 2002, at 10–11. Hufford was familiar with the facts unique to this case because Blackstone consulted with Debtor throughout its bankruptcy proceedings. Blackstone and Hufford have significant experience in valuing businesses because business valuation is the cornerstone of every restructuring situation at Blackstone. *See id.* at 11.

Hufford took into account the proposed use of the assets—the intent to operate the main facilities as going concerns. *See id.* at 21–22. Hufford's valuation took into account the fact that Debtor was compelled to seek a buyer intending to operate the facilities in order to avoid environmental shutdown liabilities. A prompt sale was required due to Debtor's financial limitations and orders entered in the case. *See generally* Memorandum Opinion, Dec. 7, 2001, at 3 (Doc. 2075) (authorizing Debtor's Asset Protection Plan and noting that Debtor loses One to Two Million Dollars ($1,000,000—$2,000,000) per day, during the administration of this case). "By preserving the operations of the [Debtor's] assets, [ISG's] purchase allowed the estate to avoid significant environmental liabilities that would have been triggered upon a shutdown scenario." The LTV Corp. Steel Asset Sale Cash Purchase Price Allocation, Allocation Hearing, Debtor's Ex. A at 2 (hereinafter "Hufford's Report").

Hufford's testimony was sufficient to carry the burden of proof. Many of objectors' witnesses made appropriate and substantial criticisms of Hufford's inputs, methodology, and conclusions. Nonetheless, Hufford's testimony remained sufficient to carry the burden of proof and no competent, alternative going concern value was offered. Objectors spent significant time arguing that Debtor's allocation was unreasonable without offering persuasive evidence of going concern values. Most of objectors' witnesses' valuations either lacked analysis or failed to consider environmental liabilities. None made global going concern valuations, and few considered the concept at all. Thus, Hufford's conclusions carry the day in the absence of more persuasive evidence.

Objectors subpoenaed Mott, ISG's president and CEO, to testify to an allocation of the sale proceeds that he created, after the

sale, involving most of the assets.[8] It is important to note that Mott did not testify that his allocation "valued" the assets or was an allocation designed to comport with the law. Mott attempted to summarize the meaning of his calculation and specifically stated that his calculation "represents how I determined to come up with the $80 million that we spent to purchase [the assets], and that's all it represents." Mott Depo. at 81. It is unclear what this means, if anything.

After thorough review, the Court concludes that Mott's testimony concerning his allocation numbers does not carry significant weight. Mott's numbers are unreliable as valuations for several reasons in addition to that set forth above. Mott valued the assets based upon a liquidation approach, despite Debtor's and Buyer's intended use for the assets as a going concern enterprise. *See id.* at 103. This does not make Mott's calculations wrong for his purposes, but makes them non-probative for a 506(a) analysis, which requires valuation in light of the proposed disposition or use. Both the buyer (ISG) and the seller (Debtor) intended for the assets' disposition and use to be that of a going concern enterprise, with the exception of a few minor assets of limited utility. Mott's liquidation based calculations are irrelevant to this matter.

Moreover, prior to this sale, Mott had never valued steel-making equipment. *See id.* at 84. Also, Mott prepared his allocation in "several hours," see *id.* at 88, without help from consultants or other outside experts, see *id.* at 87.

Mott's calculations fail to reflect what ISG would have paid for any individual asset, without the other assets. *See id.* at 93–94. Mott testified that ISG would not

have purchased Cleveland Works, Indiana Harbor Works, or Hennepin individually. *See id.* at 19. Finally, Mott stated that his allocation numbers could be changed at a later time because they were merely preliminary. *See id.* at 101. The Court cannot rely on these numbers for allocation purposes.

But, the remainder of Mott's testimony was highly persuasive. For example, Mott stated that he estimated the cost of environmental liabilities associated with the assets based upon due diligence performed prior to the sale. Mott estimated that approximately Ten Million Dollars ($10,-000,000) would be spent each year to keep plants in compliance with environmental rules. *See id.* at 26. Mott further estimated that environmental liabilities could exceed approximately Two Hundred Million Dollars ($200,000,000) in the long term. *See id.* These are similar to Debtor's conclusions. Mott also acknowledged that abandoning facilities would automatically trigger some environmental remediation. *See id.*

Objectors provided other witnesses, who testified to estimated values they placed on portions of individual assets. None of the objectors' valuation witnesses evaluated all of the factors involved with each asset. For example, excluding Mott, none of the objectors' witnesses included environmental liabilities into formulas valuing the assets. *See* Test. of William Rivich, June 19, 2002 Hearing Tr. at 48–49; Test. of Bradley Wood, June 19, 2002 Hearing Tr. at 207–08; Test. of Charles Finch, July 1, 2002 Hearing Tr. at 273. Some of the objectors' witnesses separately valued personal property at a facility without valuing real property. *See* Test. of Allen Beal-

---

**8.** The parties agreed to the admissibility of Mott's deposition because Mott was unavail- able to testify at the allocation hearing.

mear, June 19, 2002 Hearing Tr. at 267–68; Test. of Robert Heine, July 1, 2002 Hearing Tr. at 158, 164–65. Others relied upon outdated valuations. *See* Test. of William Rivich, June 19, 2002 Hearing Tr. at 45; Test. of Allen Bealmear, June 19, 2002 Hearing Tr. at 271.

### 1. Non-steel producing assets

■ In its allocation, Debtor divided the sold items into eleven (11) separate assets. Eight (8) of the eleven (11) are non-steel producing.

### a. Lorain Pellet Terminal

Debtor's expert, Hufford, relied upon a prior bid to value the Lorain Pellet Terminal (hereinafter "Lorain"). In January, 2002, the City of Lorain offered to buy Lorain. *See* Hufford's Report at 8. Hufford valued Lorain at exactly the same amount that was bid by the City of Lorain, Two Million Five Hundred Thousand Dollars ($2,500,000). *See id.* Objectors failed to offer any credible evidence rebutting Debtor's valuation of this asset, therefore the Court accepts Debtor's assigned value of the Lorain Pellet Terminal, Two Million Five Hundred Thousand Dollars ($2,500,-000).

### b. Grand River Lime Plant

Hufford's Report assigns a value to the Grand River Lime Plant of Three Hundred Thousand Dollars ($300,000). *See id.* at 9. Objectors failed to offer any credible evidence rebutting Debtor's valuation of this asset. But, Hufford reported that in February 2002, Debtor "received a bid from a potential buyer to purchase the lime plant for $500,000." *Id.* Hufford of-

fered no explanation for why he valued the lime plant below the offered bid price. The Court agrees with the Hufford Report, when it states that the bid "is the only present indication of market value." *Id.* Therefore, the Court rejects Hufford's unsupported valuation and concludes that the appropriate value for the Grand River Lime Plant is the bid price of Five Hundred Thousand Dollars ($500,000).

### c. Short–Line Railroads

The Short–Line Railroads (hereinafter "railroads") were valued by agreement of Debtor and three non-Debtor LTV-owned railroad subsidiaries (hereinafter "railroad subs").[9] Debtor needed the railroad subs' approval before the railroad assets could be sold. The railroad subs' agreement to the sale was conditioned upon appraisal of the assets. After Debtor and the railroad subs employed separate appraisers to value the railroad assets, Debtor and the railroad subs agreed to a valuation between the two appraisal amounts, or Eleven Million Two Hundred Fifty Thousand Dollars ($11,250,000). *See* Tr. of Railroad Settlement Hearing, Aug. 27, 2002. This Court approved the railroad valuation. *See* Order Approving Compromise & Settlement Between & Among LTV Steel Co., Inc. & River Terminal Railway Co., Chicago Short Line Railway Co. & The Cuyahoga Valley Railway Co., Aug. 27, 2002 (Doc. 4356).

### d. LTV Tech Center

Hufford considered several valuation methods in evaluating the LTV Tech Center (hereinafter "Tech Center"). As part of the Tech Center sale, Buyer purchased real and personal property. In valuing the

---

9. The railroad subs include Chicago Short-Line Railway Company, River Terminal Railway Company, and Cuyahoga Valley Railway Company. *See* Motion of Debtor LTV Steel Co., Inc. For an Order Approving Compromise & Settlement Between & Among LTV Steel Co., Inc. & River Terminal Railway Co., Chicago Short Line Railway Co. & The Cuyahoga Valley Railway Co., Aug. 13, 2002 at 1 (Doc. 4301). All of the railroad subs are wholly-owned subsidiaries of Debtor, but are not debtors.

real property, Hufford averaged two previous valuations of the property, a previous sale offer, and a tax assessment of the property. *See* Hufford's Report at 11. Hufford averaged a previous offer of Two Million Seven Hundred Thousand Dollars ($2,700,000) and a tax assessment of Three Million Eight Hundred Thousand Dollars ($3,800,000), and valued the Tech Center's real property at Three Million Three Hundred Thousand Dollars ($3,300,000). *See id.* Using a liquidation analysis, Hufford valued the Tech Center personal property at One Million Six Hundred Thousand Dollars ($1,600,000). *See id.*[10] Combining the real and personal property valuations, Hufford's total valuation of Tech Center property is Four Million Nine Hundred Thousand Dollars ($4,900,000). *See id.*

Objectors failed to offer any credible evidence rebutting Debtor's valuation of this asset. Therefore, the Court accepts Debtor's assigned value of Four Million Nine Hundred Thousand Dollars ($4,900,-000) for the LTV Tech Center.

### e. Cleveland Natural Gas Reserves

Hufford valued Debtor's natural gas reserves based upon the market price of gas at the time of the sale. *See id.* at 12. Buyer purchased approximately one hundred fifty thousand units (150,000 Mcf) of natural gas reserves held in storage. *See id.* At the time of the sale, natural gas was selling at Four and 13/100 Dollars ($4.13) per unit (Mcf). Applying the market value, Hufford valued the natural gas reserves at Six Hundred Twenty Thousand Dollars ($620,000). *See id.*

Objectors failed to offer any credible evidence rebutting Debtor's valuation of this asset. Therefore, the Court accepts Debtor's assigned value of Six Hundred

Twenty Thousand Dollars ($620,000) for the Cleveland Natural Gas Reserves.

### f. L–SE

Hufford valued Debtor's interest in L–SE using two separate methodologies. Debtor's interest in L–SE included its: (1) equity interest in the L–SE joint venture; and (2) real property. Hufford valued Debtor's interest in L–SE, a joint venture with Sumitomo Metals (hereinafter "Sumitomo"), using going concern analysis. *See id.* at 14. Debtor held sixty percent (60%) and Sumitomo held the remaining forty percent (40%) interest in L–SE. *See id.* at 13.

In valuing Debtor's equity interest in L–SE, Hufford considered three years worth of the facility's net sales, cost of goods sold, and overhead. *See id.* Hufford valued Debtor's interest in L–SE at Nineteen Million Three Hundred Thousand Dollars ($19,300,000). *See id.* at 14.

Hufford valued the L–SE real property based upon the rent received from leasing the property to L–SE. *See id.* at 15. The L–SE real property was owned by LTV Electro–Galvanizing, Inc. *See id.* Hufford also considered estimated environmental liabilities of One Hundred Thousand Dollars ($100,000). *See id.* Hufford valued the L–SE real property at Three Million Seven Hundred Thousand Dollars ($3,700,000). *See id.*

Objectors failed to offer any credible evidence rebutting Debtor's valuation of this asset. Therefore, the Court accepts Debtor's assigned values of Nineteen Million Three Hundred Thousand Dollars ($19,300,000) for Debtor's equity interest in L–SE and Three Million Seven Hundred Thousand Dollars ($3,700,000) for the L–SE real property lease.

---

**10.** It is unclear why a liquidation analysis was used, which is not as desirable for the reasons stated herein. But, it is the only value presented.

### g. Warren Coke Battery

Hufford valued the Warren Coke Battery based upon the most recent bid for the facility. *See id.* at 16. An offer of One Dollar ($1) was made. The bid did not assume liabilities, including environmental liabilities. *See id.* Accounting for the environmental liabilities, Hufford concluded that the Warren Coke Battery held a negative, or zero cash value. *See id.*

Objectors failed to offer any credible evidence rebutting Debtor's valuation of this asset. Therefore, the Court accepts Debtor's assigned zero valuation of the Warren Coke Battery.

### h. Pre-paid expenses

Debtor valued pre-paid expenses at One Million Five Hundred Thousand Dollars ($1,500,000). Amended Allocation, Ex. A, at 2. Objectors failed to offer any credible evidence rebutting Debtor's valuation of this asset. Therefore, the Court accepts Debtor's assigned One Million Five Hundred Thousand Dollar ($1,500,000) valuation.

### 2. Steel-producing assets

All of the assets valued prior to this point were non-steel producing facilities. Cleveland Works and Indiana Harbor Works produce steel and the Hennepin Works is a finishing facility. Cleveland and Indiana Harbor Works are both integrated steel manufacturing facilities that process raw materials from blast furnaces to a final form, typically coiled strip. *See* Tr. of Allocation Hearing, June 18, 2002, at 30. Issues involving the valuations of the steel producing assets were the most hotly contested issues in this matter.

### a. Cleveland Works

Hufford assigned a zero cash value to the Cleveland Works facility based upon several factors, including high environmental expenses, high start-up costs, and negative cash flows. *See* Hufford's Report at 24. Cleveland Works is burdened with significant environmental liabilities. In valuing this asset as a going concern, Hufford considered the Twenty–One Million Dollars ($21,000,000) Debtor spent in the past three years at Cleveland Works on environmental capital projects. *See id.* at 20.[11] Moreover, a shutdown triggers significant environmental liabilities. *See generally* Allocation Hearing, Debtor's Ex. B. Start-up costs associated with Cleveland Works are high. *See* Hufford's Report at 30. Hufford considered estimated start-up costs in excess of Seven Million Dollars ($7,000,000) in Cleveland.[12] In recent years, Cleveland's integrated steel facility has had negative cash flows. *See id.* at 22. Hufford considered negative cash flows for Cleveland Works exceeding One Hundred Million Dollars ($100,000,000) in 1999, 2000, and 2001. *See id.*

Hufford claimed he was unable to consider prior bids or offers in valuing the Cleveland Works facility, because potential buyers had only bid on individual pieces of the Cleveland facility. For example, a potential buyer bid Fifteen Million Dollars ($15,000,000) for a small portion of Cleveland West. *See* Tr. of Allocation Hearing, June 18, 2002, at 119. The "hot end," or "front end," contains most of the environmental problems. *See* Tr. of Allocation

---

11. In 1998, 1999, and 2000, Debtor spent Seven Million Three Hundred Thousand Dollars ($7,300,000), Six Million Four Hundred Thousand Dollars ($6,400,000), and Seven Million Three Hundred Thousand Dollars ($7,300,000) respectively. *See* Hufford's Report at 20.

12. Start-up costs involve costs necessary to transition a facility from "hot idle" to full operation. *See* Hufford's Report at 21.

Hearing, July 1, 2002, at 64. The bidder did not plan to take the blast furnace, or assets associated with the "hot end" of the facility. *See* Tr. of Allocation Hearing, June 18, 2002, at 119. Accepting the bid would have triggered a shutdown and significant environmental liabilities. *See id.* at 119–20.

Objectors offered testimony from Michael Gibbons (hereinafter "Gibbons"), an investment banker who advised one of the unsuccessful Cleveland Works bidders. *See* Tr. of Allocation Hearing, June 19, 2002, at 55. Gibbons testified that his client, Cleveland Steel, bid One Million Dollars ($1,000,000) for the entire Cleveland Works facility, including the assumption of environmental liabilities. Gibbons also testified that Cleveland Steel would have been willing to bid up to Twenty–Five Million Dollars ($25,000,000) for Cleveland Works. *See* Tr. of Allocation Hearing, June 19, 2002, at 56. The difference was the value of inventory [13] that would have been included. Only One Million Dollars ($1,000,000) was officially bid and the ISG sale included a separate value for inventory that is not a subject of this allocation.

Objectors offered testimony from Bradley Wood (hereinafter "Wood"), an appraiser who valued Cleveland Works at Sixty–One Million Dollars ($61,000,000). *See id.* at 180. Wood's appraisal relied upon the cost approach and two comparable sales. Wood averaged the three values to come to his final appraisal conclusion. Wood's valuation required a marketing time, but did not take into account Debtor's financial situation, see id. at 202–04, nor did it consider environmental liabilities. *See* Allocation Hearing, Cuyahoga Ex. 10 at 2 ("An environmental assessment of the subject property exceeded the scope of this report."); *see also* Tr. of Allocation Hearing, June 19, 2002, at 207–08. Wood's enticing description of this site was unintentionally blindsided by the testimony of Michael Nowacki (hereinafter "Nowacki"). Nowacki confirmed that U.S. Steel's South Works land remains virtually unused, except for a donation of parkland, ten years after the plant closed. South Works is lakefront real estate in the City of Chicago. *See* Tr. of Allocation Hearing, July 1, 2002, at 216–17.

Objectors offered testimony from Allen Bealmear (hereinafter "Bealmear"), who provided two different valuations of the personal property of Cleveland Works based upon different methodologies. Bealmear stated that the orderly liquidation method rendered a personal property value at Cleveland Works of Sixty Million Two Hundred Twelve Thousand Dollars ($60,212,000).[14] Bealmear testified that the liquidation in place method rendered a personal property value of Two Hundred Forty–Six Million One Hundred Sixteen Thousand Dollars ($246,116,000).[15]

---

**13.** Gibbons valued the inventory at approximately Twenty–Four Million Dollars ($24,000,000).

**14.** Bealmear defines "orderly liquidation" as "the estimated gross amount expressed in terms of money which could typically be realized from a sale given a reasonable period of time to find a purchaser or purchasers, the seller being compelled to sell on an 'as is' 'whereas' basis." Tr. of Allocation Hearing, June 19, 2002, at 254. Bealmear also states that orderly liquidation also assumes forced

sale with only a limited time for market exposure and has no willing seller assumptions. *See id.*

**15.** Bealmear defines "liquidation in place" as the estimated gross amount expressed in terms of money which is projected to be obtained from a failed facility, assuming that the entire facility would be sold intact within a limited time to complete the sale. Liquidation in place further considers that fair market value as normally defined could not be obtained due to the time consideration as

Bealmear's valuation took place in February 2001, a year before the sale. *See id.* at 269. Bealmear admitted during his testimony that there was no guarantee that the personal property that he valued still existed at the asset's site at the time of the sale. Additionally, the market changed. Finally, the value did not include any reduction for environmental liabilities.

After thorough review of all of the testimony, the Court concludes that Gibbons provides the most credible evidence of Cleveland Works' value. Gibbons was one of the few witnesses who was not hired by either party; he appeared via subpoena. He was knowledgeable, logical, and forthright. Gibbons' client's bid of One Million Dollars ($1,000,000) offers the most timely and credible estimate of the asset's value because it was offered by a disinterested party, at the time of the sale. Moreover, the bid was made on a going concern basis and took into account all of the facility's unique factors and included the assumption of environmental liabilities. The Court values Cleveland Works at One Million Dollars ($1,000,000).

Debtor's lumping of assets on a facility by facility basis is workable so long as the facility has no value or, if there is value, there are not different creditors with different priorities on different portions of the facility. This concern must be reconciled because Cleveland has value and there are different creditors for the east and west sides of the facility.[16]

It is clear that all of the current operating capacity is located in Cleveland East. It is being operated and Cleveland West was idled long ago. Also, the one other bidder intended to operate only Cleveland East. The only value to Cleveland West is the power facility that it shares with Cleveland East, its value idle in keeping other steelmakers out of Cleveland, portions of its idle equipment, and its highly speculative, long term real estate value. Accordingly, the Court concludes that ninety percent (90%) of the value of the Cleveland facility is allocated to Cleveland East and ten percent (10%) of the value is allocated to Cleveland West.

### b. Indiana Harbor Works

Costly environmental liabilities, start-up costs, and negative cash flows are the factors underlying Hufford's valuation of Indiana Harbor Works. Hufford considered the fact that Debtor spent Eight Million Seven Hundred Thousand Dollars ($8,700,000) in environmental capital projects at the Indiana Harbor Works facility. *See* Hufford's Report at 20.[17] Hufford anticipates that future environmental capital expenditures will be similar to historical expenditures. *See id.* Moreover, Hufford relied upon start-up costs of Twenty–Six Million Dollars ($26,000,000). Further, Hufford considered Indiana Harbor Works' positive cash flow in 1999 and negative cash flow in 2000 and 2001 of Thirteen Million Six Hundred Thousand Dollars ($13,600,000) and Eighty–One Million Dollars ($81,000,000) respectively. *See id.* at 23.

Hufford was unable to consider prior bids or offers to purchase the Indiana

---

well as the probable condition of the business under forced sale conditions. *See id.* at 255.

**16.** These facilities can clearly be separated given their historical separation, two mills owned by different predecessors of LTV, and their physical separation by the Cuyahoga River.

**17.** In 1998, 1999, and 2000, Debtor spent Seven Million Three Hundred Thousand Dollars ($7,300,000), Six Million Four Hundred Thousand Dollars ($6,400,000), and Seven Million Three Hundred Thousand Dollars ($7,300,000) respectively. *See* Hufford's Report at 20.

Harbor Works facility. Debtor's CEO testified at the sale hearing that *there had been no offer to operate Indiana Harbor during the sale process*. *See* Tr. of Sale Hearing, Feb. 28, 2002, at 37. Hufford assigned a zero cash value to the Indiana Harbor Works facility. *See* Hufford's Report at 19.

Objectors offered testimony from William Rivich (hereinafter "Rivich"), a Deputy in the Commercial Industrial Department of the Lake County Indiana Assessor's office. Rivich valued Indiana Harbor Works at Ninety–One Million Seven Hundred Fifty–Three Thousand Dollars ($91,753,000). *See* Tr. of Allocation Hearing, June 19, 2002, at 41.

Rivich's valuation is wholly unreliable for several reasons. Neither Rivich, nor the County made any effort to value the Indiana Harbor Works facility as an operating business. The County merely based its valuation on its outdated estimation of the real property and fixtures. The County's estimated real property valuation was conducted more than six (6) years ago, in 1995–1996. *See id.* at 45. Additionally, Rivich's valuation did not take into account any environmental liabilities burdening the Indiana Harbor Works facility. *See id.* at 48–49. Finally, Rivich failed to explain to the Court how he came up with his valuation.

Bealmear testified that Indiana Harbor Works' personal property should be valued at Thirty–Six Million One Hundred Seventy–Five Thousand Dollars ($36,175,000), pursuant to the orderly liquidation method, and One Hundred Seventy–Eight Million Eight Hundred Twenty Thousand Dollars ($178,820,000), pursuant to liquidation in place methodology. Again, Bealmear's personal property valuation testimony is not credible because the record lacks evidence supporting the theory that the same personal property valued by Bealmear, a

year prior to the sale, existed at the Indiana Harbor Works site at the time of the sale. *See supra.* More significantly, it excluded environmental liabilities and was not a going concern value.

Objectors also offered testimony from Nowacki. He did not value the facility.

After thorough review of all the testimony, the Court concludes that Debtor's expert, Hufford, provides the most credible evidence of Indiana Harbor Works' value. Therefore, the Court accepts Debtor's assigned zero valuation of the Indiana Harbor Works.

It is possible to assign a zero cash value to large facilities because assigning a zero cash value is different from saying that they are worthless. When valuing steel businesses, the overall picture is one of industry-wide excess capacity. An industry-wide panoramic view shows neatly arranged, parallel death spirals. *See generally* Allison Grant, *Spinoff Fights Own Death Spiral*, The Plain Dealer, Dec. 26, 2001 ("We witnessed firsthand the decline of the American steel industry starting with Youngstown Sheet & Tube 25 years ago[.]") Twenty-five (25) domestic steel or steel-related companies filed for bankruptcy from 1998 through January 2002. *See* Allocation Hearing, Cuyahoga Ex. 10 at 4. Miles of vacant mills are evident in industrial cities like Youngstown, Ohio. Scrap markets, fueled by mini-mills and others, have taken away some of the blight, but not the reality. All of the math provided by the witnesses is inescapable. These huge, industrial facilities cannot support their own weight and have fallen like dominoes.

More significantly, Debtor presented a valuation as a going concern that was sufficient to carry the burden of proof and no credible, alternative going concern value

was provided. The Court is restricted to the evidence.

### c. Hennepin Works

In contrast to Cleveland Works and Indiana Harbor Works, Hennepin is a finishing facility, and has been profitable. Hennepin's environmental liabilities and start-up costs are significantly less than the other steel-producing facilities. For example, Debtor only spent Two Hundred Thousand Dollars ($200,000) on environmental capital projects at the Hennepin Works facility in the past three (3) years. *See* Hufford's Report at 20.[18] Hufford assumes that future environmental capital expenditures will be similar to historical expenditures. *See id.* Moreover, Hufford considered lower start-up costs of One Million Dollars ($1,000,000). Further, Hufford considered a positive cash flow for Hennepin in 1999, 2000, and 2001 of Fifty-Two Million Four Hundred Thousand Dollars ($52,400,000), Six Million Seven Hundred Thousand Dollars ($6,700,000), and Thirty Million Six Hundred Thousand Dollars ($30,600,000) respectively. *See id.* at 25.

Hufford considered prior bids or offers to purchase Hennepin. U.S. Steel offered Ten Million Dollars ($10,000,000) for Hennepin. *See* Tr. of Allocation Hearing, June 18, 2002, at 158. Dofasco, a Canadian steel manufacturer, offered Thirty Million Dollars ($30,000,000) cash for the Hennepin facility. *See id.* at 159. Dofasco was also willing to assume certain environmental liabilities. *See id.* at 160.

Hufford also considered a market comparable sale in determining Hennepin's value. In June 2001, CSN purchased Heartland Steel for Fifty Million Dollars ($50,000,000) plus assumption of liabilities.

*See* Hufford's Report at 26. Heartland's capacity is less than Hennepin's.

Based upon all of the factors unique to Hennepin and the comparable sale of Heartland Steel, Hufford valued Hennepin at Eighty-Four Million Dollars ($84,000,-000). *See id.* at 19.

Bealmear testified that Hennepin's personal property should be valued at Six Million One Hundred Fifty-One Thousand Dollars ($6,151,000), pursuant to the orderly liquidation method, and Thirty-Five Million Four Hundred Seventy-Five Thousand Dollars ($35,475,000), pursuant to liquidation in place methodology. Again, the Court finds that Bealmear's valuation lacks weight in this proceeding. *See supra.*

Objectors offered the testimony of Charles Finch (hereinafter "Finch"), an expert in business valuation, to rebut the testimony of Hufford. Finch concluded that the Hufford allocations and valuations were in error because they did not follow generally accepted valuation principles. *See* Tr. of Allocation Hearing, July 1, 2002, at 236. Finch did not offer an opinion as to what the allocation should be, because he had not had enough time to prepare an allocation. *See id.* Finch testified that Hufford should not have looked backward for such a short period of time because valuation is inherently forward looking. *See id.* at 238. Moreover, Finch stated that a negative cash flow does not mean that a business has a negative value. *See id.* at 240.

Finch did not offer any new environmental estimates. He also did not opine that the environmental estimates, relied upon by Hufford, were incorrect. He stated that a going concern environmental estimate should have been provided, but failed to provide one.

---

**18.** In 1998 and 1999, Debtor spent One Hundred Thousand Dollars ($100,000) respective-

ly. *See* Hufford's Report at 20. During 2000, Debtor spent zero dollars.

Competent evidence establishes that Hennepin should be credited with every bit of value assigned to it by Debtor. The plant consistently makes money. In a capitalist system, that is the ballgame. It doesn't matter how many years a company has been in business, or how well known the name is. One cannot invest the profits of forty years ago that were distributed. The undisputed testimony is that Hennepin makes money—lots of it—and that fact is expected to continue into the future.[19]

After thorough review of all of the testimony, the Court concludes that Debtor's expert, Hufford, provides the most credible evidence of Hennepin's value because he took into account the facilities' unique characteristics. Therefore, the Court accepts Debtor's assigned Eighty–Four Million Dollar ($84,000,000) valuation of Hennepin Works.

### 3. Conclusion

For the foregoing reasons, the Court concludes that each of the integrated steel assets shall be assigned the following values:

| Asset | Value |
| --- | --- |
| Cleveland Works (total value: 1,000,000.00) | |
|    (a) Cleveland East | 900,000.00 |
|    (b) Cleveland West | 100,000.00 |
| Indiana Harbor Works | 0.00 |
| Hennepin Works | 84,000,000.00 |
| Lorain Pellet Terminal | 2,500,000.00 |
| Grand River Lime Plant | 500,000.00 |
| Short–Line RR | 11,250,000.00 |
| LTV Tech Center | 4,900,000.00 |
| Cleveland Nat. Gas Res. | 620,000.00 |
| L–SE Equity Interest | 19,300,000.00 |
| L–SE Real Property (Lease) | 3,700,000.00 |
| Warren Coke Facility | 0.00 |
| Pre-paid Expenses | 1,500,000.00 |

### D. Calculating the distribution of the sale proceeds

Debtor argues that certain assets should receive *pro rata* distribution from the sale proceeds. In other words, each asset's portion of the proceeds should be based upon the asset's percentage of the total proceeds (hereinafter "*pro rata* assets"). Debtor further argues that other assets should receive from the proceeds one hundred percent (100%) distribution of the value assigned to the assets (hereinafter "non-*pro rata* assets"[20]). Debtor's position was adequately supported in its written and oral arguments. Objectors failed to offer any argument supported by legal authority contrary to Debtor's proposed distribution method. Therefore, the Court will distribute proceeds to the *pro rata* and non-*pro rata* assets accordingly.

The Court concludes that proceeds shall be distributed to non-*pro rata* assets in the following amounts: Short-line Railroad, Eleven Million Two Hundred Fifty Thousand Dollars ($11,250,000); Pre-paid ex-

---

**19.** The strength of Hennepin's position was amplified by witnesses called by objectors. Gibbons believed Hennepin would sell for One Hundred to One Hundred Fifty Million Dollars ($100,000,000—$150,000,000). Michael Nowacki, a long time employee of America's largest integrated steel company, U.S. Steel, testified that it took U.S. Steel five years to qualify to produce the type of steel finished at Hennepin. That is a high hurdle for market entry. This restricts competition and excess capacity, which are the bane of domestic producers. *See* Tr. of Allocation Hearing, July 1, 2002, at 195.

**20.** Non-*pro rata* assets include the Short-line Railroad, Prepaid Expenses, and Cleveland Natural Gas Reserves.

penses, One Million Five Hundred Thousand Dollars ($1,500,000); and Cleveland Natural Gas Reserves, Six Hundred Twenty Thousand Dollars ($620,000).

The Court concludes that proceeds shall be distributed to *pro rata* assets in the following manner. After valuing all of the individual *pro rata* assets, the Court must distribute the cash proceeds based upon each asset's portion of the whole. Dividing the cash value assigned to each asset by the total of all *pro rata* asset values (hereinafter "net value"), each asset receives an allocation proportion (*i.e.*, Hennepin: 84,000,000/115,900,000 = .7247627265). The Court concludes that the *pro rata* allocation proportion for each of the integrated steel assets is as follows: [21]

| Asset | Pro rata allocation |
|---|---|
| Cleveland Works | .0086281277 |
| Indiana Harbor Works | .0000000000 |
| Hennepin Works | .7247627265 |
| Lorain Pellet Terminal | .0215703192 |
| Grand River Lime Plant | .0043140638 |

| | |
|---|---|
| Short–Line RR | non-*pro rata asset* |
| LTV Tech Center | .0422778257 |
| Cleveland Nat. Gas Res. | non-*pro rata asset* |
| L–SE Equity Interest | .1665228645 |
| L–SE Real Property (Lease) | .0319240725 |
| Warren Coke Facility | .0000000000 |
| Pre-paid Expenses | non-*pro rata asset* |

To determine the proceeds available for *pro rata* distribution, or the "net proceeds," [22] the value of non-*pro rata* assets and sale expenses [23] must be subtracted from the sale proceeds (80,000,000 (total proceeds)—15,000,000 (expenses)—11,250,000 (Short-line Railroad)—620,000 (Cleveland Natural Gas Reserves)—1,500,000 (Pre-paid Expenses) = 51,630,000).

Multiplying the *pro rata* allocation proportion by the net proceeds determines the distribution of cash proceeds to each asset (*i.e.*, Hennepin: .7247627265 × 51,630,000 = 37,419,499.57). Applying the aforementioned calculations to all of the assets involved in this matter, the Court concludes that the cash sale proceeds shall be distributed as follows: [24]

21. The Court recognizes that if all of the *pro rata* allocations are added together, the sum total equals .9999999999, rather than 1.0. Although the Court has power over many things, it does not have power over how numbers divide into each other. The missing numeral "1" in a column ten places to the right of the decimal point is immaterial.

22. The Sale Order states that claims will be paid based upon net proceeds, after the subtraction of expenses. "All ... Liens and Claims shall attach to the net proceeds of the Acquired Asset Purchase Price ... after the Debtor Sellers' payment of any obligations required to be paid under or in connection with the Asset Purchase Agreement[.]" Sale Order at 7. Throughout the allocation hearing, objectors occasionally suggested that expenses should not be subtracted "off the top." But, none of the objectors submitted any evidence or argument instructing the Court how

to calculate the subtraction of expenses through any other method. Further, objections, during the hearing, to the deduction of expenses off the top were untimely because the Sale Order specifically stated that claims would attach to net proceeds. *See* Sale Order at 7. The time limit for appealing this portion of the Sale Order has passed. Therefore, any objection to the distribution of net proceeds is untimely.

23. To calculate the disbursement of cash sale proceeds, the Court will subtract the amount of sale expenses claimed by Debtor. The final amount of sale expenses is yet to be determined. The Court shall retain jurisdiction over the amount of expenses allowed in this matter. *See infra* § II.E.

24. See Appendix A for the Court's calculations.

| Asset | Cash Proceeds Distribution |
|---|---|
| Cleveland Works (total distribution: 445,470.23) | |
| (a) Cleveland East | 400,923.20 |
| (b) Cleveland West | 44,547.03 |
| Indiana Harbor Works | 0.00 |
| Hennepin Works | 37,419,499.57 |
| Lorain Pellet Terminal | 1,113,675.58 |
| Grand River Lime Plant | 222,735.12 |
| Short–Line Railroad | 11,250,000.00 |
| LTV Tech Center | 2,182,804.14 |
| Cleveland Natural Gas Reserves | 620,000.00 |
| L–SE Equity Interest | 8,597,575.50 |
| L–SE Real Property | 1,648,239.86 |
| Warren Coke Facility | 0.00 |
| Pre-paid Expenses | 1,500,000.00 |

### E. Sale Expenses

The Court directs further action regarding the amount of expenses allowed in this matter. Debtor claimed that sale expenses totaled Fifteen Million Dollars ($15,000,000), without submitting any substantiating evidence. Debtor divides the expenses into two categories: (1) "a reserve of Eight Million Dollars ($8,000,000) required by Section 3.3(b) of the Asset Purchase Agreement[;]" and (2) "estimated transaction costs of Seven Million Dollars ($7,000,000)." Amended Allocation, Ex. A, at 1. Beyond the aforementioned description, Debtor failed to provide any documentation or testimony itemizing accrued expenses.

Section 3.3(b) of the Asset Purchase Agreement explains the amount and location of the Eight Million Dollar ($8,000,000) reserve fund[25] but no further evidence of individual expenses exists. The record lacks evidence sufficient for this Court to determine the reasonableness of claimed expenses.[26]

Accordingly, within thirty (30) days of the entry of this judgment, Debtor shall file an accounting of the Seven Million Dollars ($7,000,000) in transaction costs, items paid from the reserve fund, and information concerning the availability and timing of the release of deposits in the reserve fund, if any. Moreover, Debtor shall submit all agreements associated with the reserve fund. Objectors seeking a hearing on the issue of expenses, must request the hearing within sixty (60) days of the entry of this judgment.

Two orders shall be entered simultaneously to carry out this memorandum opinion.

---

**25.** Section 3.3(b) of the Asset Purchase Agreement states: "Buyer shall deliver to the Escrow Agent an amount equal to ten percent (10%) of the Acquired Asset Purchase Price (the 'Escrow Amount'), to be held and disbursed in accordance with and pursuant to the terms of the Escrow Amount Escrow Agreement[.]" Amended Allocation, Ex. A, at 11.

**26.** If, after an accounting of the reserve fund and expenses, there exists any money available for distribution, that money shall be distributed to the *pro rata* assets based upon the *pro rata* allocation proportions.

# Appendix A

## I. Distribution of the sale proceeds (a summary of all the calculations).

| Assets | Value of All Assets | Value of Pro Rata Assets Only | Pro Rata Allocation Proportion | Final Distribution |
|---|---|---|---|---|
| Cleveland Works | 1,000,000.00 | 1,000,000.00 | 0.0086281277 | 445,470.23 |
| Indiana Harbor Works | 0.00 | 0.00 | 0.0000000000 | 0.00 |
| Hennepin Works | 84,000,000.00 | 84,000,000.00 | 0.7247627265 | 37,419,499.57 |
| Lorain Pellet Terminal | 2,500,000.00 | 2,500,000.00 | 0.0215703192 | 1,113,675.58 |
| Grand River Lime | 500,000.00 | 500,000.00 | 0.0043140638 | 222,735.12 |
| Short-Line RR * | 11,250,000.00 | 0.00 | 0.0000000000 | 11,250,000.00 |
| LTV Tech Center | 4,900,000.00 | 4,900,000.00 | 0.0422778257 | 2,182,804.14 |
| Cleveland Nat. Gas Reserves * | 620,000.00 | 0.00 | 0.0000000000 | 620,000.00 |
| L-SE Equity Interest | 19,300,000.00 | 19,300,000.00 | 0.1665228645 | 8,597,575.50 |
| L-SE Real Property (Lease) | 3,700,000.00 | 3,700,000.00 | 0.0319240725 | 1,648,239.86 |
| Warren Coke Facility | 0.00 | 0.00 | 0.0000000000 | 0.00 |
| Prepaid Expenses * | 1,500,000.00 | 0.00 | 0.0000000000 | 1,500,000.00 |
| | 129,270,000.00 | 115,900,000.00 | 0.9999999999 | 65,000,000.00 |
| | total value | net value | | |

*non-pro rata assets

## II. Calculations

### A. Allocation Percentage

| | Pro Rata Assets Only | | Net Value | | Pro Rata Allocation Proportion |
|---|---|---|---|---|---|
| Cleveland Works | 1,000,000.00 | divided by | 115,900,000.00 | = | 0.0086281277 |
| Indiana Harbor Works | 0.00 | divided by | 115,900,000.00 | = | 0.0000000000 |
| Hennepin Works | 84,000,000.00 | divided by | 115,900,000.00 | = | 0.7247627265 |
| Lorain Pellet Terminal | 2,500,000.00 | divided by | 115,900,000.00 | = | 0.0215703192 |
| Grand River Lime | 500,000.00 | divided by | 115,900,000.00 | = | 0.0043140638 |
| Short-Line RR | non-pro rata asset | divided by | 115,900,000.00 | = | 0.0000000000 |
| LTV Tech Center | 4,900,000.00 | divided by | 115,900,000.00 | = | 0.0422778257 |
| Cleveland Nat. Gas Reserves | non-pro rata asset | divided by | 115,900,000.00 | = | 0.0000000000 |
| L-SE Equity Interest | 19,300,000.00 | divided by | 115,900,000.00 | = | 0.1665228645 |
| L-SE Real Property (Lease) | 3,700,000.00 | divided by | 115,900,000.00 | = | 0.0319240725 |
| Warren Coke Facility | 0.00 | divided by | 115,900,000.00 | = | 0.0000000000 |
| Prepaid Expenses | non-pro rata asset | divided by | 115,900,000.00 | = | 0.0000000000 |
| | | | | | 0.9999999999 |

**B. Net proceeds**

| | |
|---|---:|
| total cash proceeds | 80,000,000.00 |
| <minus expenses> | -15,000,000.00 |
| | 65,000,000.00 |
| Minus non-pro rata expenses: | |
| <minus RR Subs value> | -11,250,000.00 |
| <minus Natural Gas Reserves value> | -620,000.00 |
| <minus Prepaid Expenses value> | -1,500,000.00 |
| Net proceeds | 51,630,000.00 |

**C. Final Distribution**

| | Pro Rata Allocation Proportion | | Net proceeds | | Pro Rata Distribution | Non-pro rata Distribution |
|---|---|---|---|---|---:|---:|
| Cleveland Works | 0.0086281277 | x | 51,630,000.00 | = | 445,470.23 | |
| Indiana Works | 0.0000000000 | x | 51,630,000.00 | = | 0.00 | |
| Hennepin Works | 0.7247627265 | x | 51,630,000.00 | = | 37,419,499.57 | |
| Lorain Pellet Terminal | 0.0215703192 | x | 51,630,000.00 | = | 1,113,675.58 | |
| Grand River Lime | 0.0043140638 | x | 51,630,000.00 | = | 222,735.12 | |
| Short-Line RR Equip. | non-pro rata asset | x | 51,630,000.00 | = | n/a | 11,250,000.00 |
| LTV Tech Center | 0.0422778257 | x | 51,630,000.00 | = | 2,182,804.14 | |
| Cleveland Nat. Gas Reserves | non-pro rata asset | x | 51,630,000.00 | = | n/a | 620,000.00 |
| L-SE Equity Interest | 0.1665228645 | x | 51,630,000.00 | = | 8,597,575.50 | |
| L-SE Real Property (Lease) | 0.0319240725 | x | 51,630,000.00 | = | 1,648,239.86 | |
| Warren Coke Facility | 0.0000000000 | x | 51,630,000.00 | = | 0.00 | |
| Prepaid Expenses | non-pro rata asset | x | 51,630,000.00 | = | n/a | 1,500,000.00 |
| | | | | | 51,630,000.00 | 13,370,000.00 |

51,630,000 + 13,370,000 = 65,000,000.00

## ORDER

For the reasons set forth in the Court's memorandum opinion entered this date, the Court: (1) overrules the objectors' motion *in limine* and admits the testimony of William West, except as to any specific objections that were granted therein, and admits the exhibits labeled LTV B,[1] LTV

1. LTV B and C were also referred to as Debtor's B and Debtor's C.

C, Cuyahoga 14, and Cuyahoga 15; and (2) sustains in part and overrules in part Debtor LTV Steel Company, Inc.'s Amended Notice of Allocation of Net Proceeds of the Integrated Steel Sale.

The Court concludes that each of the integrated steel assets shall be assigned the following values:

| Asset | Value |
| --- | --- |
| Cleveland Works (total value: 1,000,000.00) | |
| (a) Cleveland East | 900,000.00 |
| (b) Cleveland West | 100,000.00 |
| Indiana Harbor Works | 0.00 |
| Hennepin Works | 84,000,000.00 |
| Lorain Pellet Terminal | 2,500,000.00 |
| Grand River Lime Plant | 500,000.00 |
| Short–Line RR | 11,250,000.00 |
| LTV Tech Center | 4,900,000.00 |
| Cleveland Nat. Gas Res. | 620,000.00 |
| L–SE Equity Interest | 19,300,000.00 |
| L–SE Real Property (Lease) | 3,700,000.00 |
| Warren Coke Facility | 0.00 |
| Pre-paid Expenses | 1,500,000.00 |

The Court concludes that each *pro rata* asset shall be assigned the following *pro rata* allocation proportion:

| Asset | Pro rata allocation |
| --- | --- |
| Cleveland Works | .0086281277 |
| Indiana Harbor Works | .0000000000 |
| Hennepin Works | .7247627265 |
| Lorain Pellet Terminal | .0215703192 |
| Grand River Lime Plant | .0043140638 |
| Short–Line RR | non-*pro rata asset* |
| LTV Tech Center | .0422778257 |
| Cleveland Nat. Gas Res. | non-*pro rata asset* |
| L–SE Equity Interest | .1665228645 |
| L–SE Real Property (Lease) | .0319240725 |
| Warren Coke Facility | .0000000000 |
| Pre-paid Expenses | non-*pro rata asset* |

Based upon the aforementioned *pro rata* allocation proportions, the Court concludes that the cash sale proceeds shall be distributed as follows:

| Asset | Cash Proceeds Distribution |
| --- | --- |
| Cleveland Works (total distribution: 445,470.23) | |
| (a) Cleveland East | 400,923.20 |
| (b) Cleveland West | 44,547.03 |
| Indiana Harbor Works | 0.00 |
| Hennepin Works | 37,419,499.57 |
| Lorain Pellet Terminal | 1,113,675.58 |
| Grand River Lime Plant | 222,735.12 |
| Short–Line Railroad | 11,250,000.00 |
| LTV Tech Center | 2,182,804.14 |
| Cleveland Natural Gas Reserves | 620,000.00 |
| L–SE Equity Interest | 8,597,575.50 |
| L–SE Real Property | 1,648,239.86 |
| Warren Coke Facility | 0.00 |
| Pre-paid Expenses | 1,500,000.00 |

There is no just reason for delay.

**IT IS SO ORDERED.**

### ORDER

For the reasons set forth in the Court's memorandum opinion entered this date, the Court sustains in part and overrules in part Debtor LTV Steel Company, Inc.'s Amended Notice of Allocation of Net Proceeds of the Integrated Steel Sale.

The Court retains jurisdiction over the amount of expenses allowed in this matter. Debtor claims Fifteen Million Dollars ($15,000,000) in sale expenses, including a reserve of Eight Million Dollars ($8,000,000) and estimated transaction costs of Seven Million Dollars ($7,000,000). Within thirty (30) days of the entry of this Order, Debtor shall file with the Court: (1) an accounting of all expenses or transaction costs associated with the sale of the integrated steel assets; (2) an accounting of items paid from what Debtor terms the "reserve fund;" and (3) all agreements associated with the reserve fund, including information concerning the availability and timing of the release of deposits in the reserve fund, if any. Any party objecting to the sale expenses must seek a hearing within sixty (60) days of the entry of this Order.

**IT IS SO ORDERED.**